UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Christine DeMaria, et al., | No. 2:23-cv-01798-KJM-CSK |
| Plaintiffs, | ORDER |
| v. | |
| Yolo County Sheriff's Office, et al., | |
| Defendants. | |

Anthony DeMaria, who goes by Tony, and his wife Christine allege officers of the Yolo County Sheriff's Department unlawfully searched their home and seized a valuable collection of weapons and ammunition. They also allege the officers used excessive force during the search. In this lawsuit they assert several constitutional claims. Defendants move to dismiss under Federal Rule of Civil Procedure 12(b)(6), and as explained in this order, that motion is **granted in part with leave to amend**.

I.   **BACKGROUND**

The DeMarias live on an 830-acre plot in a remote part of Yolo County near Guinda, California. Compl. ¶ 22, ECF No. 1. Mr. DeMaria is a retired lawyer in his late seventies. *See id.* ¶ 23. Over the past twenty-five years, he has assembled a collection of rare and iconic Colt revolvers, Winchester rifles and other firearms, largely for their value as old west Americana. *See id.* ¶ 24.

1

For some time now, Mr. DeMaria has suffered from dementia. *Id.* ¶ 23. He can become aggressive, forgetful, anxious and confused. *See id.* ¶¶ 7, 23. On an April evening in 2023, Ms. DeMaria had gone to town, but Mr. DeMaria had forgotten where she was, and he was concerned when he could not find her. *Id.* ¶ 28. He came to believe she had gone out with their long-time acquaintance, James Mount, a Yolo County Sheriff's Deputy. *See id.* ¶¶ 25, 28. He tried unsuccessfully to call Deputy Mount's cell phone, then dialed 911. *See id.* ¶ 28. The call was recorded, and a transcript was later prepared:

> 911 Dispatch: 9-1-1. What's the address of the emergency?
>
> Tony: I'd like to speak to James Mount he's a deputy. I am looking for him. He has walked off with my wife. And I'm looking for him.
>
> 911 Dispatch: Okay. I can take [inaudible] in touch with him. What's your name sir?
>
> Tony: DeMaria. And they better find him damn fast.
>
> 911 Dispatch: What's your first name sir?
>
> Tony: Anthony.
>
> 911 Dispatch: Alright. And what's your address?
>
> Tony: My address?
>
> 911 Dispatch: Yes.
>
> Tony: Christ, I live in the country. I don't know what the address is.
>
> 911 Dispatch: What's your location sir?
>
> Tony: My what?
>
> 911 Dispatch: Your location.
>
> Tony: We live up in Guinda.
>
> 911 Dispatch: Okay and you don't know your address?
>
> Tony: No, I don't. I'm 80 years old and I don't worry about these things.
>
> 911 Dispatch: What's your wife's name?

| | |
|---|---|
| 1<br>2<br>3 | Tony: Christine. And they're both in deep shit. I'm a lawyer. Retired and all hell is gonna break loose when they get found. Believe me. It's gonna cost you money. |
| 4<br>5<br>6 | 911 Dispatch: Okay. Well I can direct you to the right place but I'm just not exactly sure what's going on. When you say he walked off with her. What are you referring to? |
| 7 | Tony: They disappeared together. |
| 8 | 911 Dispatch: Okay. What's your wife's first name again? |
| 9 | Tony: Jesus. Her last name or her first? |
| 10 | 911 Dispatch: How about both? |
| 11<br>12 | Tony: Try it again. DeMaria is her last name. Christine is her first. I hope I don't have to repeat it again. I'm not in a real good mood. |
| 13 | 911 Dispatch: Spell DeMaria for me so I have it right. |
| 14 | Tony: I beg your pardon. |
| 15 | 911 Dispatch: Spell the last name for me so I have it… |
| 16 | Tony: d-e-m-a-r-i-a |
| 17 | 911 Dispatch: Alright. So they have a history of doing this? |
| 18<br>19<br>20 | Tony: No. And god damn it, it's enough of this. Go look for Mount. You can get him on the radio for Christ's sakes. I know him. Call him on the radio and tell him DeMaria is after his ass. |
| 21 | 911 Dispatch: What's the best number to reach you at sir? |
| 22 | Tony: Can you do that? |
| 23<br>24 | 911 Dispatch: Well, he is not on duty tonight so I'm gonna have to . . . |
| 25 | Tony: I don't give a shit. Call him on his home phone. |
| 26 | 911 Dispatch: What's a good phone number to reach you at? |
| 27<br>28<br>29<br>30 | Tony: [Telephone number redacted]. And if I don't get a call back from you in 10 minutes there's gonna be more trouble than your police department has ever seen in its history. You get that son a bitch on the phone and have him call me now. Now. |
| 31 | 911 Dispatch: I'll have a sergeant reach out to you. |

1    Tony: I beg your pardon.

2    911 Dispatch: I'll have a sergeant reach out to you.

3    Tony: I don't want no fucking sergeant to talk to me. Call him.

4    911 Dispatch: Okay sir.

5    Tony: I will wait while you call him.

6    911 Dispatch: I'm gonna have somebody reach out to you. I'm gonna
7    disconnect with you now . . .

8    Tony: Disconnecting me? I'm gonna come after you guys with
9    everything I can think of.

10   911 Dispatch: Okay. I'm placing you on hold.

*Id.* at 8–10.

Mr. DeMaria then called another Sheriff's Deputy, Michael Glaser. *Id.* ¶ 30. According to the DeMarias' complaint, Deputy Glaser is retired or semi-retired and works on call. *Id.* ¶ 8. Despite that allegation, a search warrant application attached to the complaint refers to Deputy Glaser as a deputy without any qualification, and the DeMarias allege he played a prominent role in obtaining the warrant, executing it and seizing the weapons and ammunition. *See, e.g., id.* ¶¶ 37, 41 & Ex. A at 38.[1] According to Deputy Glaser, Mr. DeMaria was agitated and aggressive on the call. *Id.* ¶ 30. He repeated his mistaken belief that Deputy Mount had taken his wife, he demanded her return, he threatened to sue, and he said there would soon be one less deputy working for the Sheriff. *Id.*

Deputy Mount learned about Mr. DeMaria's calls later that night. *Id.* ¶ 31. He went to their home. *Id.* They spoke, and Deputy Mount left without incident. *Id.* According to a Sheriff's Office report, Deputy Mount said he was in no fear for his safety. *See id.*

But two days later, the Sheriff's Department prepared an application for a warrant to search the DeMarias' home based on a suspicion that Mr. DeMaria had made a criminal threat. *See id.* ¶ 32. As noted, copies of the warrant, application and supporting affidavit are attached to

---

[1] To avoid confusion, citations in this order refer to the page numbers applied to the warrant and application by the CM/ECF system.

4

the complaint. *See* Warrant & Appl., Compl. Ex. A, ECF No. 1. The supporting affidavit, prepared by Robert Middleman, a Sheriff's Deputy and detective, summarized DeMaria's 911 call and quoted DeMaria's demand that the dispatcher tell Mount "DeMaria is after his ass" and that there would be "hell to pay." *See id.* Ex. A at 28. Detective Middleman's affidavit also described Mr. DeMaria's call to Deputy Glaser and Mr. DeMaria's threat that there would be "one less Deputy working for the Sheriff's Office and that he will sue." *Id.*

The affidavit summarized three previous incidents in addition to these phone calls. First, it relayed a report from a man who had recently done work on the DeMarias' property. *See id.* The man saw that someone had shot at and destroyed some recently installed irrigation lines. *Id.* Mrs. DeMaria apologized and explained her husband had been angry and confused as a result of his dementia and memory problems. *Id.* Later, while the worker was repairing the damaged irrigation lines, he heard someone yelling and breaking things inside the DeMarias' home, and Mrs. DeMaria explained her husband was having another episode. *Id.*

Second, the affidavit describes a 911 call from the DeMarias' address about a year before. *See id.* The dispatcher heard an argument between a man and a woman, and the man was threatening to burn down the home. *Id.* According to Detective Middleman's affidavit, Mrs. DeMaria later told Deputy Mount she and her husband had been in an argument and he was suffering from dementia. *Id.*

Third, several years earlier, in 2017, the Sheriff's Office had taken a report of an assault by Mr. DeMaria. *Id.* The report described him as verbally abusive and stated he had attempted to strike a victim, who Detective Middleman did not identify in the search warrant affidavit. *Id.* At the time of that previous report, the Sheriff's Office determined Mr. DeMaria was a threat to the community, so it temporarily confiscated his firearm collection for safekeeping. *Id.* It later returned the collection. *Id.*

After recounting these incidents, Detective Middleman wrote in the affidavit that he believed Mr. DeMaria was dangerous and violent and had made a credible threat on Deputy Mount's life. *See id.* at 28–29. Detective Middleman did not mention, however, that Deputy Mount himself had not felt any fear, nor that Deputy Mount had visited Mr. DeMaria soon after

5

1    he heard about his calls to 911 and Deputy Glaser. *See* Compl. ¶ 33. Nor did Detective

2    Middleman interview Deputy Mount before he prepared the affidavit. *See id.* ¶ 40.

3        Based on Middleman's affidavit, the Sheriff's Office sought a warrant to apprehend

4    Mr. DeMaria and "recover all firearms in his possession." *Id.* Ex. A at 29. A judge of the Yolo

5    County Superior Court granted the application, and officers executed it the same day. *See id.*

6    at 22, 25; *see also* Compl. ¶ 32. At first, officers took a subtler tack: Deputy Glaser called

7    Mrs. DeMaria and said officers wanted to search the hills around the DeMarias' property for

8    illegal marijuana grows. *Id.* ¶ 41. Mrs. DeMaria assented on the phone, but reconsidered when

9    officers arrived. *Id.* She thought their plan was too dangerous. *Id.* She asked them to leave, but

10   they refused and executed the warrant. *Id.* Mr. DeMaria came out to meet the officers when they

11   arrived outside the home. *Id.* ¶ 44. He was distressed, but unarmed, and told the officers to

12   leave. *Id.* Sheriff's Deputies placed him in handcuffs. *Id.* Then, in the words of his complaint,

13   the officers "forcibly threw him in the back of a police car," where they waved at him and

14   taunted him. *Id.* He sustained a few cuts and bruises and a more severe injury to his back and

15   nervous system, further exacerbating his longstanding spinal stenosis. *Id.*

16       Deputies searched the DeMarias' home, where they found and seized at least 34 firearms

17   and 20,000 rounds of ammunition, almost all from locked gun safes. *Id.* ¶ 47. During the search,

18   a captain in the Sheriff's Department, Gary Hallenbeck, explained to Mrs. DeMaria, "Your

19   husband threatened to kill one of my deputies, what was I supposed to do?" *Id.* ¶ 42. Deputy

20   Mount did not participate in the search. *See id.* ¶ 43. The Sheriff's Office did not tell him about

21   it before it began. *Id.* He learned about it only after it was "largely completed." *Id.*

22       Mr. DeMaria was not arrested. *Id.* ¶ 44. Officers instead took him to a local hospital. *Id.*

23   Ever since the search, his mental health has "significantly declined." *Id.* ¶ 45. He has become

24   paranoid and disoriented, and he cannot focus on anything other than the search and seizure. *Id.*

25   He and his wife filed this lawsuit a few months after the search; she is acting as his guardian ad

26   litem. *See* Order (Oct. 26, 2023), ECF No. 23. They contend, broadly speaking, that the search

27   warrant was a "ruse" and part of a pattern of similarly illegal firearm seizures in Yolo County.

28   Compl. ¶ 37. Deputy Glaser and other unidentified members of the Sheriff's Office had

previously told Mrs. DeMaria they wanted Mr. DeMaria's guns out of the home. *Id.* ¶¶ 24, 37. The DeMarias also cite a statement from an unidentified witness who heard Deputy Glaser say, "as soon as you start getting dementia, I'm taking your guns away." *Id.* ¶ 37. The same unidentified witness is "aware of a situation" in which Yolo County Sheriff's Deputies inexplicably seized weapons from the home of a man who had died from causes unrelated to firearms. *Id.* ¶ 38. In a second similar case, deputies searched the home of a shooting victim and removed every weapon they found, regardless of any connection—or rather, the lack of any connection—to the shooting. *Id.*

The defendants in this case are the Yolo County Sheriff and Sheriff's Office, Captain Hallenbeck, Deputies Glaser and Middleman, and several other sheriff's deputies who participated in the search, including fifteen unidentified Doe defendants.[2] *See id.* ¶¶ 8–19. The DeMarias assert four claims. First, they allege the defendants deprived them of their rights under the Second Amendment to the U.S. Constitution by seizing firearms from their home. *Id.* ¶¶ 49–53. Second, they challenge the search and seizure as unreasonable and illegal under the Fourth Amendment because Deputy Middleman's affidavit was deceptive. *Id.* ¶¶ 54–59. Third, they contend the officers who participated in the search used unconstitutionally excessive force. *Id.* ¶¶ 60–64. Fourth, they allege the Sheriff and Sheriff's Office have an unconstitutional policy or custom of seizing and removing guns from private citizens "without probable cause or evidence of any crime and without legal justification, in violation of the citizens' rights under the Second Amendment." *Id.* ¶¶ 65–68. The DeMarias request compensatory and punitive damages, the costs and fees they incur in this litigation, and whatever further relief the court deems proper. *See id.* at 19–20 (prayer).

As noted, the defendants move to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See generally* Mot., ECF No. 20; Mem., ECF No. 20-1. The motion is fully briefed, and the court

---

[2] If defendants' identities are unknown when the complaint is filed, plaintiffs have an opportunity through discovery to identify them. *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980). But the court will dismiss such unnamed defendants if discovery clearly would not uncover their identities or if the complaint would clearly be dismissed on other grounds. *Id.* The federal rules also provide for dismissing unnamed defendants that, absent good cause, are not served within 90 days of the complaint. Fed. R. Civ. P. 4(m).

7

1   took the matter under submission without a hearing.  *See generally* Opp'n, ECF No. 26; Reply,
2   ECF No. 28; Min. Order, ECF No. 29.

## II.   DISCUSSION

In response to a Rule 12(b)(6) motion for "failure to state a claim upon which relief can be granted," the court begins by assuming the complaint's factual allegations are true, but not its legal conclusions.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  The court then determines whether those factual allegations "plausibly give rise to an entitlement to relief" under Rule 8.  *Id.* at 679.  This evaluation of plausibility is a context-specific task drawing on "judicial experience and common sense."  *Id.*

### A.   Search Warrant Affidavit (Claim 2)

The court begins with the DeMarias' claim that the search and seizure violated the Fourth Amendment.  The Fourth Amendment, which applies to the states by virtue of the Fourteenth, protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV. It prohibits searches under "ill-begotten or otherwise invalid" warrants.  *Bravo v. City of Santa Maria*, 665 F.3d 1076, 1083 (9th Cir. 2011).  Officers may not rely on deception to obtain search warrants.  *KRL v. Moore*, 384 F.3d 1105, 1117 (9th Cir. 2004) (quoting *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978)).

The DeMarias name all of the defendants in their Fourth Amendment claim, *see* Compl. at 16, but only Middleman prepared the allegedly deceptive affidavit.[3]  *See id.* ¶¶ 56–57.  The Sheriff's Office cannot itself be liable based on Middleman's actions alone.  Municipal governments are not automatically liable for the unconstitutional actions of their employees under § 1983, but rather only for those governments' own actions, policies and practices.  *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690–91 (1978).  In addition, although supervisors, including sheriffs, can be liable for their "own culpable action or inaction" under

---

[3] As summarized above, the DeMarias allege Deputy Glaser told Mrs. DeMaria he wanted to remove firearms from their home, and they allege he made similar statements to others, but they do not allege he played a role in preparing the allegedly misleading affidavit.  Nor do the DeMarias allege Glaser's attempts to obtain Mrs. Glaser's permission to enter their property in particular deprived them of Fourth Amendment rights.

8

§ 1983, *Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011) (citation omitted), the DeMarias do not allege Sheriff Lopez had any role in the events of this case. The motion to dismiss claim two against the Sheriff and Sheriff's Office is granted for those reasons.

The officers who did participate in the search could potentially face liability if the search was unreasonable, depending on their roles and the broader circumstances. "Officers who plan and lead a search 'must actually read the warrant and satisfy themselves that they understand its scope and limitations, and that it is not defective in some obvious way.'" *KRL v. Estate of Moore*, 512 F.3d 1184, 1190 (9th Cir. 2008) (quoting *Ramirez v. Butte–Silver Bow County*, 298 F.3d 1022 (9th Cir. 2002), *aff'd sub. nom. Groh v. Ramirez*, 540 U.S. 551 (2004)). "It is incumbent on the officer executing a search warrant to ensure the search is lawfully authorized and lawfully conducted." *Groh*, 540 U.S. at 563. "[A] warrant may be so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *United States v. Leon*, 468 U.S. 897, 923 (1984). That was the case in *Groh*, in that the warrant did not say at all what was to be seized. *See* 540 U.S. at 563.

The DeMarias' allegations do not paint a similar picture. They do not allege the warrant was itself so obviously defective that the executing officers should have realized they could not proceed. They allege the affidavit omitted specific information that made it deceptive. Nothing in the complaint suggests the supervising officers knew or should have known the warrant application was deceptive by virtue of omission, and even if they had known, it would be speculative to conclude the omissions made the warrant facially deficient.[4] The motion to dismiss claim two against the supervising officers is granted for these reasons.

The DeMarias' claims against the other officers who helped execute the search warrant—those who neither led the search nor prepared the affidavit—rest on even shakier ground. These officers were not required to "read or even see the warrant." *Ramirez*, 298 F.3d at 1026. They

---

[4] As noted, the DeMarias do not connect their Fourth Amendment claim to their allegations about Deputy Glaser's intent to remove firearms from their home or his attempt to obtain Mrs. DeMaria's permission to enter the property based on pretense. *See* Compl. ¶¶ 54–59.

were permitted "to accept the word of their superiors" after making sure they understood "the nature and scope of the warrant." *Id.* (citations, alterations and quotation marks omitted). None of the DeMarias' allegations could plausibly show the other officers overstepped the warrant's limitations or otherwise failed to make any necessary inquiries of their supervisors. The motion to dismiss claim two against these officers is also granted.

Turning finally to the claim against Detective Middleman, who prepared the warrant application and affidavit, the DeMarias ultimately will bear the burden to prove he "made deliberately false statements or recklessly disregarded the truth." *Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1126 (9th Cir. 2002) (quoting *Hervey v. Estes*, 65 F.3d 784, 790 (9th Cir. 1995)). The complaint identifies three alleged falsehoods and omissions.

First, the DeMarias allege Detective Middleman falsely claimed Mr. DeMaria had threatened to kill Deputy Mount. Compl. ¶ 56. The words in the affidavit do not bear this allegation out. Detective Middleman did not make a false claim about what Mr. DeMaria said; he drew an inference from the evidence he had at the time. As summarized above, Detective Middleman relayed in the warrant Mr. DeMaria's statements to the 911 dispatcher to warn Deputy Mount that "DeMaria is after his ass," that there would be "hell to pay," and that Deputy Mount's actions would cost the Sheriff's Office money. Compl. Ex. A at 28. He also repeated Deputy Glaser's report that Mr. DeMaria told him over the phone "there would be consequences to pay" and "there would be one less deputy working for the Sheriff's Department and that he will sue." *Id.* Combined with Mr. DeMaria's history of threats, his possession of "numerous firearms," his past destructive use of firearms, a previous assault report and his declining mental health, Detective Middleman determined DeMaria's threat was credible and willful and made with an intent to cause harm. *See id.* at 28–29. Detective Middleman's assessment might have been negligent. He also might have been negligent in his failure to consult Deputy Mount. Or he might have read the evidence incorrectly. But negligence and incorrect assumptions do not support a Fourth Amendment claim. *See Ewing v. City of Stockton*, 588 F.3d 1218, 1224 (9th Cir. 2009).

Second, the complaint alleges Detective Middleman claimed falsely that Mr. DeMaria possessed firearms with an intent to commit a crime and that the firearms were evidence of a crime. Compl. ¶ 56; *see also id.* Ex. A at 23. As with the statements in the previous paragraph, Detective Middleman's assessment of Mr. DeMaria's intent was made by way of inference, not by relying on or conveying a false statement of fact. It cannot support the DeMarias' Fourth Amendment claim.

Third, the complaint alleges Detective Middleman misleadingly and intentionally failed to mention that Deputy Mount had filed a report denying any fear of Mr. DeMaria. The affidavit similarly did not mention Deputy Mount's visit to the DeMarias' home soon after he learned about the threat. Compl. ¶ 56. The allegations regarding these omissions are different from those addressed above. "Even otherwise true observations made misleading by the omission of facts that are not themselves material may result in an affidavit that, considered as a whole, is materially misleading." *Scanlon v. County of Los Angeles*, 92 F.4th 781, 799 (9th Cir. 2024). "By reporting less than the total story, an affiant can manipulate the inferences a magistrate will draw and denude the probable cause requirement of all real meaning." *Id.* (alterations omitted) (quoting *Liston v. County of Riverside*, 120 F.3d 965, 973 (9th Cir. 1997)).

At this early stage, when the DeMarias' allegations must be taken in the light most favorable to their case, a Fourth Amendment claim against Detective Middleman is at least plausible. The story in his affidavit would have been quite different if he had written that Deputy Mount—who was assigned to the part of Yolo County where the Demarias live and who had known Mr. DeMaria for many years—did not take Mr. DeMaria's threat so seriously as to fear for his safety and visited Mr. DeMaria soon after the threat. Rather than a story of an armed and dangerous man in deteriorating mental health with a history of threats and assaults, the affidavit may very well have told a story of a confused and elderly lawyer wielding verbal threats of implausible but decidedly nonviolent litigation.

Detective Middleman argues the DeMarias' theory of deception suffers from a crucial flaw: there is no allegation to show Detective Middleman knew what Deputy Mount thought about Mr. DeMaria's threat. *See* Mem. at 5. "In short," Middleman argues, he "could not have

11

1 *omitted* information that he did not know." *Id.* (emphasis in original). But the DeMarias do
2 allege Deputy Mount prepared a report, and in Detective Middleman's affidavit, he states he
3 reviewed "official reports/records" about the threats and spoke "with other law enforcement
4 officers or witnesses." Compl. Ex. A at 28. The court must accept the allegations and draw
5 inferences favorable to the plaintiffs from them. One reasonable inference to be drawn is that
6 Middleman read Mount's report and knew he was not in fear. Whether a developed factual
7 record bears that inference out is a question for another day.

8     If an affidavit is misleading, "the court must determine the materiality of the allegedly
9 false statements or omissions." *Ewing*, 588 F.3d at 1224. "A misrepresentation or omission is
10 material if a court would have declined to issue the order had the defendant been truthful."
11 *Scanlon*, 92 F.4th at 799 (quoting *David v. Kaulukukui*, 38 F.4th 792, 801 (9th Cir. 2022)). The
12 question is whether, after the necessary corrections, "given all the circumstances set forth in the
13 affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay
14 information, there is a fair probability that contraband or evidence of a crime will be found in a
15 particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (quotation marks omitted).

16     Detective Middleman cited California Penal Code section 422(a) in his affidavit. *See*
17 Compl. Ex. A at 29. That section punishes those who make criminal threats.[5] One element of a
18 crime under section 422 is proof the threat "actually caused [the complaining witness] to be in
19 sustained fear for [his] own safety." Judicial Council of Cal. Crim. Jury Instr. 1300 (2024). If
20 Middleman's affidavit had disclosed Deputy Mount's report that he was not actually in fear, it is
21 plausible the reviewing judge would not have found probable cause to suspect Mr. DeMaria had
22 made a criminal threat.

---

[5] "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished . . . ." Cal. Pen. Code § 422(a).

In sum, the motion to dismiss claim two against Detective Middleman is denied. The motion to dismiss claim two as to the other defendants is otherwise granted with leave to amend, if possible within the confines of Rule 11. *See, e.g.*, *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001) ("[L]eave to amend should be granted unless the district court determines that the pleading could not possibly be cured by the allegations of other facts." (citation and quotation marks omitted)).

**B.    Second Amendment (Claim 1)**

The DeMarias also claim they were deprived of their Second Amendment right to keep and bear arms. They contend officers unconstitutionally seized Mr. DeMaria's firearm collection based on their assessment of Mr. DeMaria as not "sufficiently responsible." Compl. ¶ 52. The defendants argue the DeMarias cannot pursue a Second Amendment claim "because the guns and ammunition were seized pursuant to a valid search warrant," Mot. at 2; *see also* Mem. at 7, or alternatively, in accordance with a warrant that appeared valid on its face, *see* Mem. at 7–8. They also argue the DeMarias have no Second Amendment right to possess the specific weapons in question. *See* Mem. at 10–11.

The court takes the last of these arguments first. A brief summary of the Supreme Court's modern Second Amendment cases is a necessary background. In 2008, the Supreme Court held that ordinary citizens have a Second Amendment right to possess handguns in the home for self-defense. *See generally District of Columbia v. Heller*, 554 U.S. 570. In 2010, the Court confirmed states are bound by the Second Amendment. *See generally McDonald v. Chicago*, 561 U.S. 742. In 2022, the Court made clear the Second Amendment protects the possession of other weapons "'in common use' today for self-defense." *Bruen*, *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 32 (quoting *Heller*, 554 U.S. at 627). The Court explained how to decide whether a particular regulation or government action violated the Second Amendment: "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 17. To overcome that presumption, the government must demonstrate a challenged regulation or action "is consistent with this Nation's historical tradition of firearm regulation." *Id.* And finally, earlier this year, the Court applied this standard and

clarified, in one respect at least, what it means for a regulation or government action to be "consistent with" the historical tradition. *See generally United States v. Rahimi*, 144 S. Ct. 1889 (2024).

The defendants' motion targets the first part of the test above: whether the plain text of the Second Amendment covers the DeMarias' conduct. They contend the DeMarias have no Second Amendment right to possess guns as collectors' items or for sentimental value, but rather only for self-defense. *See* Mem. at 10–11. The DeMarias allege the weapons seized from their home included revolvers, target pistols, single-shot lever-action rifles and shotguns. Compl. ¶ 24. It is at least plausible these weapons could be used for "self-defense" in the terms of the Supreme Court's decisions in *Heller* and *Bruen*. But it is unclear whether all these weapons are in "common use." Whether a particular weapon or accessory is protected can be a difficult question to answer, as a matter of both law and fact. *Cf., e.g.*, *Rupp v. Bonta*, ___ F. Supp. 3d ___, No. 17-00746, 2024 WL 1142061, at *9–10 (C.D. Cal. Mar. 15, 2024) (evaluating whether a particular type of semiautomatic rifle is in common use for self-defense), *appeal filed*, No. 24-2583 (Apr. 24, 2024); *Nat'l Ass'n for Gun Rts. v. Lamont*, 685 F. Supp. 3d 63, 87–91, 94–98 (D. Conn. 2023) (conducting similar analysis); *De. State Sportsmen's Ass'n, Inc. v. De. Dep't of Safety & Homeland Sec.*, 664 F. Supp. 3d 584, 591–97 (D. Del. 2023), *aff'd on other grounds*, 108 F. 4th 194 (3d Cir. 2024) (same). But the court cannot say at this early stage that none of the seized weapons is even plausibly protected—such as the revolvers and pistols and perhaps the shotguns—and the parties' briefing includes only a few short sentences on that question. Nor have defendants offered any evidence or arguments to show the disputed seizure was "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. For these reasons, the court will not dismiss the first claim based solely on the types of weapons seized.

Moving, then, to the effects of the warrant, the parties cite no relevant authority. But several federal courts have held that a plaintiff cannot pursue a Second Amendment claim about guns seized by officers who are executing a facially valid warrant. *See, e.g.*, *Rocha v. County of Tulare*, Cal., 627 F. App'x 623, 624 (9th Cir. 2015) (unpublished) ("[T]he bare allegation that defendants seized [the plaintiff's] firearm during a warrant-backed search is insufficient to state a

14

Second Amendment violation."); *Brodrick v. Washington Cnty. Bd. of Cnty. Commissioners*, No. 22-271, 2023 WL 113723, at *2 (N.D. Okla. Jan. 5, 2023) ("The Court is not prepared to pronounce a rendering of the Second Amendment so broad such that officers are not able to execute facially valid warrants related to firearms without fear of incurring Second Amendment liability . . . ."); *Siratsamy v. Sacramento Cnty. Sheriff Dep't*, No. 21-0678, 2021 WL 2210711, at *5 (E.D. Cal. June 1, 2021) ("The mere occurrence of a . . . seizure . . . , however, is not enough to establish a Second Amendment violation." (alteration in original) (quoting *Partin v. Gevatoski*, No. 19-1948, 2020 WL 4587386, at *4 (D. Or. Aug. 10, 2020))). For this reason, and because no allegations show the warrant was invalid on its face, the DeMarias cannot pursue a Second Amendment claim against the officers who supervised and conducted the search based on their current allegations.

As explained above, however, the complaint does include allegations to support a claim that Detective Middleman obtained the warrant in part based on misleading omissions. But if the search warrant was not valid and the search was unreasonable, a Second Amendment claim would be duplicative of a Fourth or Fourteenth Amendment claim as a practical matter, at least given the DeMarias' current allegations. *See, e.g.*, *Walters v. Wolf*, 660 F.3d 307, 317–18 (8th Cir. 2011) (rejecting a Second Amendment claim as inferior and potentially duplicative of a Due Process claim). Several courts have also held that "[t]he Second Amendment is not implicated by the seizure of individual firearms," assuming, of course, that the plaintiffs otherwise retain their rights to keep and possess arms more broadly. *Aikens v. Bond*, No. 21-381, 2021 WL 5051134, at *4 (D. Del. Nov. 1, 2021) (collecting authority). The complaint does not permit the court to infer that the search actually deprived the DeMarias of their right to keep and possess arms rather particular weapons. That said, the majority of these decisions were issued before the Supreme Court's recent opinions, including those in *Bruen* and *Rahimi*, and the law of firearms seizures also remains relatively unsettled in the lower federal courts. For these reasons, the Second Amendment claim is dismissed, but with leave to amend to permit the DeMarias to refine their allegations if they can to assert a non-duplicative Second Amendment claim based on a cognizable legal theory.

1        **C.      Excessive Force (Claim 3)**

2        In the DeMarias' third claim, they allege the officers who executed the search warrant used excessive force. *See* Compl. at 17. Although the complaint appears to contemplate an excessive force claim by both Mr. and Mrs. DeMaria, they do not oppose the motion to dismiss Mrs. DeMaria's claim. *See* Opp'n at 11–12. Nor does the complaint include allegations of force against Mrs. DeMaria. Her claim is dismissed.

As for Mr. DeMaria's claim, when a person alleges officers have used excessive force during an investigation or arrest, courts measure the description of the officers' actions against the Fourth Amendment. *See Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam); *Thompson v. Rahr*, 885 F.3d 582, 586 (9th Cir. 2018). There are three steps to the analysis. First, the court must consider the "type and amount of force inflicted." *Thompson*, 885 F.3d at 586 (quoting *Espinoza v. City & County of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010)). Second, the court must assess the "government's interests." *Id.* (quoting *Espinoza*, 598 F.3d at 537). For example, how serious was the suspected crime? Did the suspect pose an immediate threat to the officers or public? Was the suspect resisting arrest or attempting to escape? *See id.* And third, the court must decide whether the government's interests justified the force used. *See id.* This is an objective test. It assesses the officers' conduct "from the perspective of a reasonable officer on the scene." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

In this case, at the first step, Mr. DeMaria alleges officers restrained him in handcuffs and "forcibly threw him in the back of a police car," causing cuts and bruises and exacerbating his longstanding back injury. Compl. ¶ 44. At the second step, the officers' had an interest in preventing Mr. DeMaria from interfering in their search and in preventing violence. According to the warrant application, the Sheriff's Department had received reports of aggression and threats by Mr. DeMaria, and officers suspected they would find many firearms at his home. The DeMarias do not allege these reports were false, and they agree there were many firearms in the home. Mr. DeMaria also was uncooperative when the officers arrived, if not physically violent. But on the other hand, the suspected crime was not a violent crime. At the third step, it is at least plausible some officers used excessive force when they "threw" him into the car. Mr. DeMaria

16

was elderly, and no allegations show he was armed, resisted, attempted to flee or posed any physical threat that might have warranted a "throw." Moreover, allegations of taunting and waving once Mr. DeMaria was detained in the back of a police car permit the plausible inference officers were not in fact concerned for their safety.

It is unclear, however, which deputies allegedly used what force. The complaint does not identify the officers who "threw" Mr. DeMaria into the car. The court thus will dismiss Mr. DeMaria's excessive force claim as currently pled against the named defendants; that claim will proceed against the unidentified Doe defendants to facilitate discovery and a potential amendment if discovery reveals their identities. *See Gillespie*, 629 F.2d at 642. If the DeMarias have more specific information about the conduct of the named officers now, they may also include that information as allegations in the amended complaint permitted by this order.

### D. Municipal Liability (Claim 4)

The DeMarias' final claim is against the Sheriff's Office. Municipal bodies such as the Sheriff's Office "are responsible only for 'their *own* illegal acts.'" *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (emphasis in original) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)). "They are not vicariously liable under § 1983 for their employees' actions." *Id.* The constitutional injury must occur during the execution of an official "policy or custom." *Monell*, 436 U.S. at 694. "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick*, 563 U.S. at 61.

The DeMarias first allege the Sheriff's Office has a policy or practice of "seizing and removing guns from private citizens' possession without probable cause or evidence of any crime and without any legal justification." Compl. ¶ 66. A claim of an unconstitutional practice such as this one must rest on "practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy," not sporadic or random incidents. *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). The pattern must reflect "similar constitutional violations." *Connick*, 563 U.S. at 62.

The DeMarias describe two examples of firearms seizures in their complaint: first, the seizure of weapons from the home of a man who had died from causes unrelated to firearms, and second, the seizure of weapons from the home of a shooting victim. *See* Compl. ¶ 38. The complaint also quotes an unidentified witness's claim that Deputy Glaser threatened to seize firearms from people with dementia. *See id.* The complaint does not include enough information about these other seizures to show they were part and parcel of the same official policy or practice as the one at issue in this case, let alone that the policy was unconstitutional. The complaint leaves the motivations behind the other two seizures to speculation. The seizure of firearms is the only apparent connection between those seizures and this case.

In addition to a policy or custom, the DeMarias allege the Sheriff's Office has not disciplined officers who have illegally searched for and seized firearms. Compl. ¶ 66. This generic allegation does not suffice to survive dismissal, as it does little more than reiterate the applicable legal test. *See AE ex rel. Hernandez v. County of Tulare*, 666 F.3d 631, 637 (9th Cir. 2012).

For these reasons, the fourth claim is dismissed with leave to amend. *See id.* (permitting amendment in similar circumstances).

### III. CONCLUSION

The motion to dismiss (ECF No. 20) is **granted in part** as follows:

- The motion to dismiss claim one is granted with leave to amend.
- The motion to dismiss claim two against Middleman is denied. The motion to dismiss claim two against all other defendants is granted with leave to amend.
- The motion to dismiss claim three is granted with leave to amend as to the claims against defendants Hallenbeck, Glaser, Middleman, Wirick, Machado, Goodrich, Richter, Tolentino and Vega. The motion to dismiss claim three is denied as to the claims against the unidentified Doe defendants.
- The motion to dismiss claim four is granted with leave to amend.

An amended complaint may be filed **within twenty-one days**.

/////

1    This order resolves ECF No. 20.

2    IT IS SO ORDERED.

3    DATED: August 13, 2024.

_____
CHIEF UNITED STATES DISTRICT JUDGE